UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X

FTI CONSULTING, INC.,

                    Plaintiff,

          - against -                    **MEMORANDUM AND ORDER**

R. DEAN GRAVES, ALVAREZ & MARSAL,         05 Civ. 6719 (NRB)
INC., and ALVAREZ & MARSAL DISPUTE
ANALYSIS AND FORENSIC SERVICES, LLC

                    Defendants.

--------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

        Plaintiff FTI Consulting ("FTI") alleges claims for breach

of contract against defendant R. Dean Graves ("Graves") and

tortious interference with contract against defendants Alvarez &

Marsal, Inc. ("AMC") and Alvarez & Marsal Dispute Analysis and

Forensic Services, LLC ("A&M DAFS") (collectively, "A&M").

These claims arise out of an Employment Agreement signed between

Graves and FTI, and Graves' subsequent decision to leave his job

as a consultant at FTI to join A&M.[1]  Plaintiff moved for summary

_____

        [1] We note that defendants dispute whether Alvares & Marsal, Inc.
is a proper party in this case.  It appears that Alvarez & Marsal
Holdings, LLC, and not Alvarez & Marsal, Inc., is the majority owner
of A&M DAFS, Graves' employer.  See, e.g., Deposition of R. Dean
Graves ("Graves Dep.") Ex. GG (Letter from Sam Pyland, Managing
Director, Alvarez & Marsal Holdings LLC, to R. Dean Graves, offering
position of Managing Director with Alvarez & Marsal Dispute Analysis
and Forensics, LLC, dated Jan. 25, 2005).  However, the conclusions
drawn here with regard to A&M would have applied to Alvarez & Marsal
Holdings, LLC, had plaintiffs properly named them as a defendant.
Since at oral argument defendants stated that this potential error in

judgment on all claims and for an injunction barring Graves from competing with FTI for a period of two years, and defendants cross-moved for summary judgment.   For the reasons set forth below, plaintiff's motion is denied and defendants' motion is granted in its entirety.

## BACKGROUND[2]

Plaintiff FTI, a Maryland corporation with its principal offices in Annapolis, provides forensic consulting and litigation services and restructuring advisory services.   FTI LLC, formally DAS Business, Inc., is a wholly-owed subsidiary of FTI.   Defendant AMC is a multi-disciplinary consulting firm which provides a broad range of advisory services through various operational divisions that operate as independent limited liability companies.   Plaintiff states that AMC is the majority shareholder of defendant A&M DAFS, a limited liability company which provides analytical and investigative services to clients involved in complex financial disputes.   Defendant R. Dean Graves has been employed as a Managing Director of A&M's Houston office since March 1, 2005.

Graves, who had been a partner at Arthur Andersen starting in 1996, then joined KPMG in May of 2002 after the demise of

---

plaintiff's filings is immaterial in the event that the motion is resolved in their favor, see Transcript of Oral Argument dated June 19, 2007 ("Tr.") at 3, we need not resolve the differences between the parties' understandings of the organization of Alvarez & Marsal.

[2] Except where indicated, there are no genuine issues regarding the following facts.

Arthur Andersen.[3]   Graves served as a partner in KPMG's Dispute Analysis Services ("DAS") division beginning in May of 2002.

In the summer of 2003, KPMG and FTI began discussing FTI's possible acquisition of KPMG's DAS practice.   After negotiations, FTI ultimately decided that it would not agree to purchase KPMG's DAS practice unless at least 28 of KPMG's DAS partners agreed to accept employment with FTI, consisting of six key KPMG DAS principals and an additional minimum of twenty-two DAS professionals.[4]   Accordingly, KPMG offered to pay each partner who accepted employment with FTI a lump sum payment based on a multiple of 1.8 times his or her 2005 annual salary as an incentive to commit to joining FTI.   Pursuant to this offer, Graves reached an agreement with KPMG to sign an employment contract with FTI in exchange for $948,000, to be paid by KPMG following the consummation of the sale of the DAS practice.[5]   As a condition of employment at FTI, each KPMG

---

[3] Although plaintiff characterizes this transaction as a sale of Arthur Andersen's forensic litigation services group to KPMG, see Pl. 56.1 Stmt. ¶ 24, defendants contend that there was no such sale. Instead in 2002, several Arthur Andersen partners moved to KPMG, and KPMG paid for the release of their restrictive covenants.   See Def. Resp. Pl. 56.1 Stmt. ¶ 24.

[4] Although neither party at oral argument could say for certain how many KPMG DAS professionals would have qualified as counting toward the minimum of twenty-two DAS consultants necessary to facilitate the sale, both sides agree that the number was in the high thirties.   See Tr. at 7.

[5] It appears that certain KPMG partners who did similar work to Graves within KPMG's DAS group did not move to FTI.   See, e.g., Deposition of Dominic Di Napoli, dated June 23, 2006 ("Di Napoli Dep.") at 32.

partner and professional was required to execute an employment agreement containing several post-employment restrictive covenants. Graves executed his Employment Agreement with FTI on October 3, 2003. See Graves Aff. Ex. D. ("Employment Agreement" or "Agreement").

The terms of the Employment Agreement included several post-employment obligations. First, the Agreement provided that during a restricted period -- which the parties agree is two years -- Graves would not "directly or indirectly, be employed by, lend money to, invest in, or engaged in a Competing Business . . . in any Market Area." Employment Agreement ¶ 12. The Agreement defines Competing Business as "any financial restructuring advisory services line of business actively conducted by [FTI] or previously conducted by KPMG in which the Executive is substantially engaged during the period of the Executive's employment with [FTI] and at the time Executive's employment ends."[6] Id. ¶ 18(b). "Market Area" is defined as "within a 25 mile radius of any location in which [FTI] has an office and in which [FTI] offers or provides financial consulting or DAS consulting services to clients in the ordinary

---

[6] "Competing Business" is further defined as not including "[1] any aspect of the financial restructuring advisory services business which is not a material revenue source of [FTI]; [2] the furnishing of services to lenders, and [3] the furnishing of services to other potential clients who or with respect to matters that would not be likely to be served by or referred to Company." Employment Agreement ¶ 18(b).

course of its business." Id. ¶ 18(c).   Second, the Agreement
contained non-solicitation provisions, whereby for two years
after employment with FTI, Graves would:

> not, directly, or indirectly . . . intentionally: (i)
> solicit business regarding any case or matter upon
> which Graves worked on behalf of [FTI] during the term
> of this Agreement; (ii) solicit any person or entity
> who is a client of [FTI's] financial consulting
> business in which Executive was engaged at the time of
> the termination of Executive's employment with [FTI];
> (iii) solicit, induce, or otherwise attempt to
> influence any person whom [FTI] employs or otherwise
> engages to perform services . . . to leave the employ
> of or discontinue providing services to [FTI].

Id. ¶ 13.   Third, the Agreement restricted the direct or
indirect use, disclosure, or publication of confidential
information that Graves may learn or become aware of over the
course of his employment with FTI or KPMG.   See id. ¶ 14.
Paragraph 26 of the Employment Agreement notes that the
Agreement is governed by New York law.

Pursuant to the agreement, Graves became employed by FTI to
provide forensic litigation consulting services as a Senior
Managing Director in its DAS division on or about October 31,
2003. Graves worked at FTI in its Forensics Litigation and
Consulting division ("FLC") from November of 2003 through
February 28, 2005.   On March 1, he began working at A&M's
Houston office.

As noted earlier, the crux of the dispute in this case
involves Graves' decision to leave FTI and join A&M.   In early

5

January of 2005, Graves was contacted by Sam Pyland, an A&M Managing Director, regarding his potential employment with the company.  Pyland and William Abington, another Managing Director at A&M and a long time friend of Graves, had previously attempted to recruit Graves to join the company in 2003, when FTI was in the process of acquiring KPMG's DAG business, but those negotiations had not resulted in an offer of employment. Graves' renewed discussions with Pyland in January of 2005 continued over several weeks.  These negotiations culminated on or about January 25, 2005 in a formal offer of employment from AMC to Graves of a position as a Managing Director at A&M DAFS, along with a series of financial incentives, including equity, increased compensation, and a substantial bonus based on an owner-operated business model.  Graves executed AMC's offer letter on February 2, 2005, after tendering his resignation to Roger Carlile, Senior Managing Director at FTI.  Although Graves' employment agreement with FTI required 90 days prior notice of resignation, Graves requested permission from Carlile to leave prior to the expiration of the 90 day period, since he believed that his matters could be transitioned in less than 90 days.  See Graves Dep. Ex. II.  Plaintiffs claim that FTI consented to Graves' breach of the Employment Agreement in this regard "solely and exclusively" because of defendants' assurances that Graves' employment with A&M DAFS would not

contravene the terms of the Employment Agreement.   Amended Complaint ("Am. Compl.") ¶ 26.   According to plaintiffs, relying upon those assurances, FTI prepared a consulting agreement for Graves to sign with AMC's and/or A&M DAFS's consent, pursuant to which Graves would provide services on an independent contractor basis to FTI as a way of assisting FTI in meeting client needs and expectations in their ongoing matters with current clients. However, defendants refused to finalize and execute the consulting agreement because, according to plaintiff, Graves was in the process of transferring those clients and ongoing matters to himself as an employee of A&M DAFS.   Id. ¶ 28.   By contrast, defendants assert that it was Pyland who first proposed such an arrangement to Carlile on April 1, 2005, and that Carlile did not respond to the offer until May 16, 2005, see Affidavit of Sam Pyland (Pyland Aff.) Ex. A., after those clients who wanted to continue to use Graves had already asked FTI for their files so as to cease their use of FTI's services, see Graves Aff. Ex. H-J.   Plaintiff claims that AMC and A&M DAFS hired Graves for the express purpose of attaining his sales contacts and confidential information he knew about FTI's business and to induce Graves to breach the terms of his Employment Agreement. Id. ¶ 29.   Plaintiff also alleges that Graves was soliciting other clients, matters, and business at the direct expense of FTI.   As evidence, plaintiff points to letters from clients of

FTI received in March of 2005, requesting that their files be transferred back to them, with the intention of retaining A&M in lieu of FTI.

The amended complaint in this case contains two separate causes of action. The first is a breach of contract claim against Graves, alleging that his actions were in contravention of paragraphs 12 (governing "Non-Competition Covenants") and 14 of the Employment Agreement (governing "Confidential Information of Company"),[7] and that he did not give the 90 days notice required by paragraph 9(a) of the Employment Agreement. Am. Compl. ¶ 36. As part of this claim, plaintiff also alleges that Graves breached "his common law duties of loyalty owed to his employer at the time." Am. Compl. ¶ 40. However, FTI in its motions papers argues for summary judgment on Graves' violation of paragraph 13 of the Agreement, governing non-solicitation of FTI's clients and employees, despite the fact that FTI's amended complaint does not allege a violation of paragraph 13. See, e.g., Plaintiff's Memorandum in Support ("Pl. Mem. Supp.") at 20, 25. Although it goes without saying that a memorandum supporting plaintiff's motion for summary judgment is not an

_____

[7] We note that plaintiff does not discuss paragraph 14 in any of its papers, and that in its summary of argument they frame their motion as "against Graves for breach of his Employment Agreement with FTI . . . , specifically with respect to paragraphs 12, 13, and 18." See Pl. Mem. Supp. at 1. At oral argument, however, plaintiff listed the paragraphs allegedly breached by defendants to include paragraphs 12, 13, and 14, concerning confidentiality. See Tr. at 4. Accordingly, we will address the confidentiality provisions below.

appropriate vehicle to amend its pleadings, in light of Rule 15(b) and our interest in resolving all of the potential claims before us, we will examine the enforceability of the non-solicitation provisions of the Agreement.  The second claim in the amended complaint is a tortious interference with contract claim against A&M, as plaintiffs allege that despite defendant companies' knowledge of Graves' obligations under the Employment Agreement to FTI, they hired him as a "Managing Director" because they wanted Graves to disclose FTI's proprietary and confidential information, including but not limited to Graves' customer contact information.  Am. Compl. ¶ 41-43.  Plaintiff moves for summary judgment on all its claims, an injunction ordering Graves to cease his employment with A&M DAFS or any other FTI competitor providing forensic litigation and consulting services for two years, and a trial on monetary damages.

We shall first discuss the standard for summary judgment before turning to each of plaintiffs' claims in turn.

<u>**DISCUSSION**</u>

**I.  Summary Judgment Standard**

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   In deciding a motion for summary judgment, the evidence submitted must be viewed in the light most favorable to the nonmoving party.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).   Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   Even if parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."   Golden Pacific Bancorp. v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004) (internal citations and quotation marks omitted).   In addition, once the moving party has made a sufficient showing, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."   Id. (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

## II.  Breach of Contract Claim against Graves

Both plaintiff and defendants argue they are entitled to summary judgment with regard to Claim I, which alleges that Graves breached his October 31, 2003 Employment Agreement with

FTI.  As noted above, the Employment Agreement between plaintiff and Graves is governed by New York law.  Under New York law, the enforceability of the restrictive covenants found within the Employment Agreement turns on whether the Agreement is viewed as arising out of the sale of the business, as plaintiff suggests, or should be viewed as an ordinary employment contract, as defendants assert.

    **1.    Employment Agreement as Arising out of Sale of Business or as Employment Contract**

New York courts have recognized restrictive covenants in three types of contracts:  (1) contracts for the sale of a business; (2) ordinary commercial contracts; and (3) employment contracts.  Mathias v. Jacobs, 167 F.Supp.2d 606, 610 (S.D.N.Y. 2001).  A restrictive covenant in a contract for the sale of a business limits the seller's right to launch a new enterprise which competes with the business sold.  See id. (citing Chevron U.S.A., Inc. v. Roxen Serv., Inc., 813 F.2d 26, 28-29 (2d Cir. 1987)).  There is routine enforcement of restrictive covenants in the context of a sale of business because it is assumed that the buyer has in part bargained for the good will of the seller's customers.  Thus, if a seller is permitted to initiate a competing enterprise, the buyer would potentially be deprived of the full benefit of her bargain, since the seller's competing effort would presumably attract the patronage of the seller's

former clients.  Id. at 610-611; Purchasing Assocs. v. Weitz, 13 N.Y.2d 267, 271, 246 N.Y.S.2d 600 (1963).  By contrast, restrictive covenants in employment contracts are "subject to more exacting scrutiny than are those in contracts for the sale of business," since public policy militates in favor of economic competition, individual liberty, and protection of employees from employers' superior bargaining position.  See Mathias, 167 F.Supp. at 611; Reed, Roberts Assocs., Inc. v. Strauman, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679-80 (1976).

The parties disagree as to how this Court should treat Graves' covenant not to compete.  Plaintiff argues that since the Employment Agreement arises out of the sale of KPMG's DAS practice to FTI, the restrictive covenant is governed by the standard for enforceability of non-compete covenants governing the sale of a business, and need not meet the higher standard for enforcement of a non-compete employment covenant.  See Pl. Mem. Supp. at 16-17.  Under such a standard, FTI would need to prove that the covenant was not "more extensive, in terms of time and space, than is reasonably necessary to the buyer for the protection of his legitimate interest in the enjoyment of the asset bought."  Sager Spuck Statewide Supply Co. Inc. v. Meyer, 273 A.D.2d 745, 746, 710 N.Y.S.2d 429, 430 (3rd Dep't 2000).

FTI, however, cannot proffer any evidence to support its assertion that "Graves received $948,000 for selling his KPMG DAS partnership interest and entering into his FTI Agreement." Pl. Mem. Supp. at 18.   Instead, the record establishes that Graves' receipt of $948,000 was strictly a one-time, lump-sum payment promised to him by the KPMG equity partners to induce him to accept employment with FTI.   Graves executed the Employment Agreement on October 3, 2003.   Graves Aff. ¶ 16. Three weeks later, FTI purchased KPMG's DAS practice by executing an Asset Purchase Agreement (the "APA") dated October 22, 2003.   Graves Aff. ¶¶ 7-8; Dempsey Aff. Ex. A (Asset Purchase Agreement).   Although it is factually accurate that the payment was made to Graves after the sale of KPMG's practice group to FTI, and that the proceeds of the sale went towards Graves' payment, this fact does not change the fundamental nature of the transaction.   The proposal to Graves was offered by the senior partners of KPMG directly as an incentive to the non-equity KPMG professionals to join FTI, <u>see</u> Carlile Dep. Day 1 at 50-52, and FTI had no involvement in this discussion, <u>see</u> Tr. 29-30.   As FTI's interests were limited to securing the employment of the 28 KPMG professionals in exchange for the purchase price, the source and manner of distribution of the payment of $948,000 to Graves does not transform the transaction from one which is fundamentally internal to KPMG.   Further,

Graves had no legal or equitable interest in any of KPMG's assets, and despite the title of "partner" was an ordinary employee of KPMG, <u>see</u> Graves Aff. ¶ 5.  As such, Graves was not a party to the APA.  Accordingly, we view the Employment Agreement as a transaction which is separate and distinct from the APA signed by KPMG and FTI.  This conclusion is further supported by the fact that FTI requires all of its Senior Managing Directors to sign similar non-compete agreements, even when they are not hired as part of an acquisition, <u>see</u> DiNapoli Dep. at 59-61; Carlile Dep. Day 2 at 136-37, and that the APA contained its own non-compete provision applicable to KPMG as the seller.  <u>See</u> APA at 29-30.  As such, "[t]he covenants at bar, though arising out of a sales contract, pertain to employment between the parties and, therefore, must meet the criteria applicable to employment contracts."  <u>Alexander & Alexander Services, Inc. v. Maloff</u>, 105 A.D.2d 1066, 1068, 482 N.Y.S.2d 386, 388 (4th Dep't 1984).  Thus, we turn to whether these restrictive covenants conform to New York law.

### 2. New York Law Governing Restrictive Covenants in Employment Contracts

"New York has adopted th[e] prevailing standard of reasonableness" with respect to employee agreements not to compete.  <u>BDO Seidman v. Hirshberg</u>, 93 N.Y.2d 382, 389 (1999).  A non-compete clause is reasonable only if:  (1) the restrictive

covenant is no greater than is required for the protection of the legitimate interest of the employer; (2) the restrictive covenant does not impose undue hardship on the employee; and (3) the restraint on competition is not injurious to the public. See id.  The violation of any prong renders the covenant invalid.  Id.

With regard to the first prong, New York courts have limited cognizable employer interests to protection against misappropriation of the employer's trade secrets or of the confidential customer lists, and protection from competition by a former employee whose services are unique or extraordinary. See Reed, Roberts Assocs., 40 N.Y.2d at 308.  Thus, to prevail on its claims seeking the enforcement of the restrictive covenants found within Graves' Employment Agreement, FTI must identify a legitimate employer interest for each provision of the Agreement it wishes to enforce, and failure to do so entitles the defendants to summary judgment with respect to that aspect of the claim.

### a.   Paragraph 12:  Non-Competition Covenants

Plaintiff claims that Graves breached his agreement not to compete by joining a competitive division of A&M, and then competing for the same engagements upon which FTI was actively bidding.  See Pl. Mem. Supp. at 20.  Specifically, plaintiff points to an engagement that FTI's Senior Managing Director

15

Richard Hoban lost with U.S. Metals, which was instead awarded to Graves.  See id.  Although defendants concede that if the terms of the non-competition covenant were enforceable, Graves' actions would constitute a breach, they assert that the record does not show Graves' skills to be unique and extraordinary, and that consequently FTI has not met its burden to establish a legitimate interest protected by Graves' covenants not to compete.  We agree.

Although New York courts have deemed professionals to provide "unique or extraordinary" services, the application of the reasonableness test to the employee restrictive covenants context requires an assessment of the particular facts and circumstances giving rise to the agreement and the employee's role within the employer's firm.  See, e.g., BDO Seidman, 93 N.Y.2d at 389-90.  For example, in BDO Seidman, the Court of Appeals declined to enforce a non-compete covenant against an accountant in a national accounting firm which restricted competition in a market consisting of the entirety of a major metropolitan area.  There, the court was careful to note that the accountant's status in the firm was not based upon the uniqueness or extraordinary nature of the accounting services he generally performed on behalf of the firm, and stated that New York courts had found unique and extraordinary services only in rare instances where the former employee would have been in

direct competition with the employer for referrals from a "narrow group of primary health providers in a rural geographic market for their medical or dental practice specialty." BDO Seidman, 93 N.Y.2d at 390-91.

Plaintiff argues that "the harm to FTI arising out of Graves' unique services is a sufficient basis to enforce the non-compete." Pl. Repl. Mem. at 5. In support, plaintiff references Graves' description of his work, namely that "most if not all of the matters [he] work[s] on are by their nature unique," Graves Aff. ¶ 3, as an admission that his services are unique. This misconstrues Graves' statement, which is that by the very nature of his employment, each case on which Graves works presents new and different issues, and that his experience is the embodiment of the vast array of issues he has analyzed over the years. See id. That is not to say, however, that the services which Graves performs are so unique and extraordinary that they could not have been performed by another analyst with comparable expertise. Further, Graves explains that there is no "client list, algorithm, or other proprietary method of performing the[ ] consulting services" at issue here, id., and plaintiffs point to no evidence to the contrary. The fact that the condition precedent to FTI's purchase of the KPMG practice was merely that any 22 of KPMG's 30-plus non-principal partners needed to sign employment agreements, without any mention of

Graves, and that Carlile described Graves as an underperformer at FTI during 2004, the year prior to Graves' departure, see Carlile Dep. Day 1 at 152-153, suggest Graves' services were not so unique and extraordinary within the context of the practice group. Consequently, we find that plaintiff FTI has failed to identify a legitimate business interest which is protected by the scope of the non-compete clause contained within paragraph 12 of Graves' Employment Agreement, and thus that this provision is unenforceable with regard to Graves.

### b.   Paragraph 13:  Non-Solicitation Covenants

FTI alleges that "Graves has, in his tenure at A&M, worked with FTI clients, solicited additional FTI clients by submitting bids and proposals to obtain more work from those clients, and has engaged in competitive bidding against FTI for new clients." Pl. Repl. Mem. at 12.  According to FTI, "Graves lined up FTI clients in preparation for his departure from FTI, while lulling FTI into complacency by telling his FTI colleagues that he would be doing non-competitive work at A&M in a different service location." Pl. Mem. Supp. at 20.  Further, FTI asserts that but for Graves' relationships with FTI personnel, "A&M would not have had the insight into soliciting Graves' 'right hand man,' and other key FTI employees." Id. at 20-21.  We shall examine the non-solicitation of clients provision before turning to the issue of non-solicitation of employees.

18

### i.  Non-Solicitation of Clients

Plaintiff argues that Graves notified FTI clients of his resignation prior to notifying FTI and continued to service FTI clients after he accepted and commenced his employment at A&M. Although it appears that the vast majority of the matters that Graves worked on while at FTI remained with the firm after his departure,[8] including Graves' most lucrative engagement involving the Department of Justice, plaintiffs assert that following Graves' resignation from FTI, several FTI clients requested that their files either be returned to them or transferred to Graves at A&M.  Specifically, plaintiffs point to:  (1) the Baylor College of Medicine, who had two matters with FTI, one involving an insurance claim and one regarding a dispute over funds involving the Methodist Hospital; (2) the Plum v. BP engagement; and (3) the Hawkins Estate engagement.[9]  See Pl. Rule 56.1 ¶¶ 91-

---

[8] Approximately 90 percent of Graves' matters remained at FTI after he left to join A&M.  Tr. at 34.

[9] The potential lost profit on these matters, in total, has been estimated to be $65,000.  See Tr. 38-39.  Although plaintiff also initially argued that Graves had breached his obligations not to compete or solicit clients by working on matters for Metals USA while at A&M, the record reveals that this assertion was based on a misinterpretation of emails sent by Metals USA.  In an email dated April 15, 2005, FTI employee Richard Hoban states that Metals USA was going to retain FTI, but that Metals USA's General Counsel selected A&M instead because of a prior relationship with "Dean."  See Graves Aff. Ex. N.  The "Dean" referred to in Mr. Hoban's email was not Dean Graves, but instead Dean Swick, an A&M Managing Director working out of A&M's Houston office.  Graves Aff. ¶ 48; Swick Aff. ¶¶ 2-3.  Mr. Swick enjoyed a longstanding relationship with Metals USA's General Counsel and solicited that work for A&M without Graves' assistance. Id.  Since Graves began work on the Metals USA matter after Swick had

---

93.   In support, plaintiff relies solely upon the speculation of Robert Carlile.   Carlile testified that it appeared to him, based on emails and communications with clients and Graves, that these three clients were aware that Graves was leaving FTI to join A&M DAFS, "probably before" Graves informed FTI, and that the clients wanted to leave with him.   See, e.g., Carlile Deposition, dated June 13, 2006 ("Carlile Dep.") at 26.

Plaintiff's claim that Graves breached the non-solicitation provisions applicable to his clients fails for several reasons. First, paragraph 13 of the Employment Agreement only prohibits the solicitation of clients by Graves.   The provision does not prevent Graves from working on any matter or for any client of FTI, so long as he did not solicit the work.   FTI employees have acknowledged that they have no information as to whether Graves solicited any of those clients, see Van Tassel Dep. at 102-103; Carlile Dep. June 13, 2006, at 172-75.   Further, although Carlile noted at his deposition that he suspected that Graves had spoken to his clients and at the very least informed them that he was leaving FTI, see Carlile Dep. June 13, 2006, at 174-75, that supposition is insufficient to give rise to the inference that Graves was in contravention of his duty not to solicit the clients to join him at A&M.   This is especially so

---

already secured that work for A&M, it cannot be said that Graves' work on the Metals USA was in violation of the restrictive covenants.

since Carlile admits that Graves was cooperative during the transition, and that Graves was acting in an appropriate manner in terms of meeting his obligations during that timeframe, see id. at 173-74. Carlile never confirmed his suspicions by asking the clients if they had in fact spoken to Graves before Graves' departure, or the content of any such communication. See id. at 175. Thus, plaintiff's claim rests solely on Carlile's suspicions that Graves had informed his clients of his departure prior thereto. Even assuming that Carlile's hunch is true, this act alone cannot be viewed as sufficient to give rise to an inference that he solicited FTI's clients and falls short of establishing contravention of the provision not to solicit clients. The Employment Agreement only restricts Graves' active solicitation of FTI's clients; simply informing them of FTI's departure is not restricted by the contract's terms.

Second, FTI has no cognizable interest in the relationships between Graves and two of the clients at issue, Baylor College of Medicine and BP, since they were not acquired over the course of Graves' employment with FTI. Under New York law, FTI may establish a legitimate interest so as to restrict Graves' use of client relationships if it can show that FTI enabled Graves to acquire relationships with the clients through his performance of services for the firm's clientele during the course of his employment; however, FTI cannot extend the covenant to FTI

clients with whom Graves did not develop a relationship during the course of his employment with FTI.  See BDO Seidman, 93 N.Y.2d at 392; Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc., 323 F.Supp.2d 525, 535 (S.D.N.Y. 2004) ("The employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment."). In addition to Graves' affidavit, which details his "longstanding involvement with [Baylor College of Medicine and BP] dating back to [his] days at [Arthur] Andersen," before his employment with KPMG, see Graves Aff. ¶¶ 30, 57, correspondence from these two clients to FTI confirm that their relationships with Graves predated his tenure at FTI.[10]  Consequently, plaintiff cannot sustain its claim as a matter of law, since there is no evidence in the record that these relationships commenced during Graves' employment at FTI and were developed at FTI's expense, as is required for the restrictive covenant to be

---

[10] For example, a letter from an attorney for BP America Production Company requesting that FTI send Graves the BP case file explicitly states that the retention of FTI in this matter "stemmed solely from [his] prior relationship and experience with Mr. Dean Graves." See Carlile Dep. Ex. 30 (Letter from Jeff Weems, Esq., Harrison, Bettis, Staff, McFarland & Weems, LLP, to Caryl Misrack, FTI Consulting, dated March 11, 2005).  A similar request from an attorney representing Baylor College of Medicine notes that Mr. Graves was engaged by Baylor's legal department in June of 2001, more than two years prior to his employment with FTI.  See Carlile Dep. Ex. 29 (Letter from David H. Brown, Esq., Vinson & Elkins LLP, to Debbie Mills, FTI Consulting, dated March 9, 2005).

enforceable under New York law.  Although plaintiffs posit that these client relationships were purchased by FTI when they employed Graves, this argument fails given the fact that KPMG did not purchase any assets from Arthur Andersen after its dissolution.

Third, it appears that with regard to the third client at issue, Hawkins Estate -- a relationship which defendants admit was developed by Graves over the course of his employment at FTI -- Hawkins Estate informed FTI that if Graves was not available to work on the matter, they would retain Ernst & Young instead of FTI.  See Graves Aff. Ex. J.  Consequently FTI has no claim of damages resulting from the loss of the Hawkins Estate matter, since Hawkins Estate would not have remained with FTI in the wake of Graves' departure regardless, and would have instead retained a competitor of both FTI and A&M.  Thus, even assuming that Graves had in some way violated his non-solicitation covenant with regard to Hawkins Estate, there would be no basis for a damage award to FTI.

### ii.  Non-Solicitation of Employees

Plaintiff further asserts that Graves solicited FTI Director Tyler Langenkamp, and Managers Josh Shepard, Meagan Bennett, and Billie Davis to join him at A&M.  See Pl. Mem. Supp. at 14.  Although it is true that four individuals left FTI to join A&M in temporal proximity to Graves' departure, sworn

affidavits from each of the four individuals, Graves' testimony from his deposition and his affidavit, and deposition testimony from William Abington, the A&M Managing Director who hired these FTI employees, all unequivocally state that Graves did not solicit these FTI employees and that Graves played no role in their employment with A&M.  See Langenkamp Aff. ¶¶ 2-3; Bennett Aff. ¶¶ 2-3; Shepard Aff. ¶¶ 2-3; Davis Aff. ¶¶ 2-3; Graves Dep. at 9-10; Graves Aff. ¶¶ 40-41; Abington Dep. at 139-41, 148-49. FTI's only evidence to the contrary is, again, speculation from Carlile that since Graves was acquainted with the individuals in question, he "must" have had a hand in their recruitment.  See Carlile Dep. June 13, 2006, at 250-252.  That speculation is insufficient to establish a material dispute over this fact, especially in light of the fact that other FTI employees admit that there is no evidence that Graves actually solicited the four former employees.  Van Tassel Dep. at 72-76; Dadonna Dep. at 74-81.  Accordingly, defendants are entitled to summary judgment on this aspect of the breach of contract claim as well.

### 3.  Paragraph 9(a):  90 Day Notice

Plaintiff also assert Graves' failure to provide 90 days notice prior to his leaving violated the terms of his employment.  Paragraph 9(a) of the Employment Agreement states that Graves "may voluntarily resign [his] employment under this Agreement at any time upon at least 90 days prior written notice

to Company.   The Company may waive such notice or authorize a shorter notice period." Employment Agreement ¶ 9(a).   On February 2, 2005, Graves tendered his resignation to Roger Carlile.   See Graves Aff. Ex. E.   In email correspondence which followed that day between Graves and Carlile, Graves clarified that his intent was to give notice, and that he intended to stay as long as necessary to transition his engagements and other matters, which he believed would not take the 90 days provided for under the Employment Agreement.   See Graves Aff. Ex. F.   On February 15, 2005, Carlile copied Graves on a email to various personnel which announced Graves' impending departure from FTI, and which stated that Pyland, A&M's Managing Director, and Graves had agreed that Graves would comply with all of the terms of FTI's restrictive covenants as written, and that he would not be working in a division of A&M which was in competition with FTI.   Id. Ex. K.   Graves responded to this email on February 17, 2005, writing that with regard to his post-employment obligations to FTI, he intended to comply with all of his lawful obligations, but did not believe that the obligations necessarily encompassed all of the provisions for the non-solicitation of clients encompassed by Carlile's email, and clarified that neither Pyland nor Graves had "made any representations or commitments regarding the area in which" Graves would be working upon commencement of his employment with

A&M.  _Id._ Ex. L.  A week later, Carlile, after consulting with Pyland, confirmed in email to Graves that Graves' last day at FTI would be February 28, 2005.  _Id._ Ex. M.

On the basis of these emails, defendants assert that Carlile authorized a shorter notice period, as is provided for in paragraph 9(a) of the Employment Agreement.  Plaintiff argues that Carlile's consent to a shorter notice period was given in reliance of the representations made by Graves and A&M that Graves would not be employed by a direct competitor of FTI.  See Tr. 22-23.  This assertion is implausible in light of the February 17th email, in which Graves makes abundantly clear to Carlile that neither he nor Pyland has taken any position as to the type of work Graves would be engaging in with A&M.  Such judicious language can hardly be construed as misleading FTI about Graves' future endeavors.  Accordingly, we conclude that plaintiff consented to less than 90 days notice, and that Graves did not violate this provision of his contract.

### 4.  Duty of Loyalty

Defendants move for summary judgment with regard to plaintiff's claim of a breach of a duty of loyalty.  See Am. Compl. ¶ 40.  Defendants argue that a claim asserting breach of duty of loyalty is a common law tort which falls outside the scope of the Employment Agreement, and thus is not governed by the Agreement's New York choice of law provision, but rather by

Texas law.   Plaintiff, by contrast, argues that the choice of law provision in the Employment Agreement is broad enough to encompass the related tort of breach of duty of loyalty.   We agree with plaintiff's conclusion that New York law governs the breach of duty of loyalty claim against Graves.

To begin, since our jurisdiction is grounded in diversity, we apply New York's choice-of-law rules.   <u>Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.</u>, 414 F.3d 325, 331 (2d Cir. 2005), <u>cert. denied</u> 126 S.Ct. 2968 (2006).   "New York courts decide the scope of choice-of-law clauses under New York law, not under the law selected by the clause, which here also happens to be New York law."   <u>Id.</u> at 333.   Although defendants rely upon <u>Finance One</u> and other authorities for the proposition that under New York law, tort claims are generally outside the scope of contractual choice-of-law provisions that specify which law governs the construction of the terms of the contract, they are incorrect in their characterization of a breach of a duty of loyalty as a tort claim.   Under New York law, "[t]he employer-employee relationship is one of <u>contract</u>, express or implied . . . . Fundamental to that relationship is the proposition that an employee is to be loyal to his employer and is . . . at all times bound to exercise the utmost good faith and loyalty in the performance of his duties."   <u>Western Electric Company v. Brenner</u>, 41 N.Y.2d 291, 392 N.Y.S.2d 409, 411 (1977) (emphasis

added) (internal quotation omitted).  In light of the fact that the Employment Agreement memorialized the contractual relationship which constitutes the basis of FTI's breach of loyalty claim, we agree with plaintiff in concluding that this claim sounds in contract and is governed by the Employment Agreement's choice-of-law provision.  See Klock v. Lehman Bros. Kuhn Loeb Inc., 584 F.Supp. 210, 214 (S.D.N.Y. 1984).

That being said, we nonetheless conclude that defendants are entitled to summary judgment under New York law.  The basis of plaintiff's breach of loyalty claim is Graves' solicitation of FTI clients and employees, and the diversion of FTI's business to himself when he joined A&M.  See Pl. Repl. Mem. 17-18.  Although Graves' active solicitation of FTI's clients and employees and diversion of FTI's business while still employed by FTI would be in contravention of his duty of loyalty, American Federal Group, Ltd. v. Rothenberg, 136 F.3d 897, 906 (2d Cir. 1998), as discussed previously, the record does not support a conclusion that Graves actively solicited either his clients or his fellow FTI employees.  At most, plaintiffs may be able to establish that Graves informed his FTI clients and coworkers that he intended to leave FTI while still employed by FTI.  However, such an act would be insufficient to constitute a breach of his duty of loyalty, since merely taking steps not involving any dereliction of positive duties to a current

employer in preparation for taking a competitive job does not involve any breach of fiduciary duty. Id. Accordingly, we grant summary judgment for defendants on plaintiff's claim of breach of duty of loyalty.

## II. Tortious Interference with Contract Claim Against A&M

With regard to the tortious interference with contract claim, plaintiff relies upon New York law, see Pl. Mem. Supp. at 21, whereas defendants again rely upon Texas law. See Def. Mem. Supp. at 16. As discussed above, we are to apply New York law to determine whether the Employment Agreement's choice-of-law clause applies to this claim. Under New York law, tort claims are generally outside the scope of contractual choice-of-law provisions that specify which law governs the construction of the terms of the contract. See, e.g., Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) ("Under New York law, a choice-of-law provision indicating that the contract will be governed by a certain body of law does not dispositively determine that law which will govern a claim of fraud arising incident to the contract.") (emphasis in original); Rosenberg v. Pillsbury Co., 718 F.Supp. 1146, 1150 (S.D.N.Y. 1989) ("While [a choice-of-law] provision is effective as to breach of contract claims, it does not apply to fraud claims, which sound in tort."). We find no material distinction with regard to the choice-of-law provision

found here and that found in Finance One,[11] in which the Second
Circuit stated that although "[p]resumably a contractual choice-
of-law clause could be drafted broadly enough to reach such tort
claims . . . no reported New York cases present such a broad
clause," 414 F.3d at 335, and then declined to apply New York
law to extra-contractual setoff rights in light of the
reluctance of New York courts to read choice-of-law clauses
broadly.  Id.  Accordingly, we decline to apply New York law to
the breach of the duty of loyalty claims here on the basis of
the choice-of-law clause found in the Employment Agreement,[12] and
instead must independently determine, using New York choice-of-
law principles, what law to apply to plaintiff's tortious
interference claim.

Under New York law, the first step in any case presenting a
potential choice of law issue is to determine whether there is
an actual conflict between the laws of the jurisdictions
involved; if no conflict exists, then the inquiry ends.  Matter

---

[11]  Compare Employment Agreement ¶ 26 ("This Agreement shall be
governed by the internal laws of the State of New York . . . .") with
Finance One, 414 F.3d at 332 ("This Agreement will be governed by and
construed in accordance with the laws of the State of New York
(without reference to choice of law doctrine.")

[12]  We note that we find plaintiff's reliance on Turtur v.
Rothschild Registry International, Inc., 26 F.3d 304 (2d Cir. 1994),
unavailing for the same reasons as set forth by the Second Circuit in
Finance One.  The court in Turtur was not applying New York law to
determine the scope of the contractual choice-of-law clause at issue
in that case, but instead relied upon Texas law, wherein choice-of-law
provisions are read more broadly.  See Finance One, 414 F.3d at 333-34
(distinguishing Turtur).

of Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993).   We find the laws of both states to be in accord.   The elements of a tortious interference with contract under New York law are as follows:   "(1) the existence of a valid contract between plaintiff and its employees; (2) defendants' knowledge of that contract; (3) defendants' intentional inducement of employees to breach that contract; and (4) damages."   See Lockheed Martin Corp. v. Aatlas Commerce Inc.,[13] 283 A.D.2d 801, 803, 725 N.Y.S.2d 722, 725 (3rd Dep't 2001).   Under Texas law, "[t]he elements of tortious interference with a contract are:   (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss."   Powell Industries, Inc. v. Allen, 985 S.W.2d 455, 456 (Tex. 1998).   In light of the fact that we find no breach of contract, both states' laws point to the conclusion that there can be no tortious interference with a contract if there was no breach.   Consequently, we grant defendants summary judgment on this claim as well.

---

[13] This is the correct spelling of defendant's name.

## CONCLUSION

For the reasons set forth above, summary judgment is granted to defendants on all counts, and accordingly plaintiff's motion is denied.

**IT IS SO ORDERED.**


Dated:      New York, New York
            July 30, 2007

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

32

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Counsel for Plaintiff

Frederick D. Braid, Esq.
Timothy M. Singhel, Esq.
Holland & Knight LLP
195 Broadway
New York, NY 10007

Counsel for Defendant

Aime Dempsey, Esq.
Robert D. Goldstein, Esq.
Epstein Becker & Green, P.C.
250 Park Avenue
New York, NY 10177